**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Appeals of Armitage, <u>et al.</u>                }
                                                                  }
                                                                  }        Docket Nos. 51-4-03 Vtec and
                                                                  }        84-5-03 Vtec
                                                                  }
                                                                  }

<u>Decision and Order</u>

Margaret W. Armitage and other property owners appealed in Docket No. 51-4-03 Vtec from a February 27, 2003 decision of the Planning Commission of the Town of Pittsford, granting site plan approval for a proposed post office project, and appealed in Docket No. 84-5-03 Vtec from an April 21, 2003 decision of the Zoning Board of Adjustment (ZBA) granting conditional use approval for the project. Appellants are represented by Stephanie J. Kaplan, Esq. and Appellee-Applicants Pittsford Enterprises, LLP and Joan S. Kelley are represented by Vincent A. Paradis, Esq. The term " Appellee-Applicant" in the singular will be used to refer to Pittsford Enterprises, LLP. The Town of Pittsford did not enter an appearance in either of these appeals.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit with the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellee-Applicant Pittsford Enterprises, LLP holds an option to purchase both lots in a two-lot subdivision of a 2.69-acre parcel of land owned by Joan S. Kelley and located near the southeast corner of U.S. Route 7 and Plains Road in the " Village" zoning district of the Town of Pittsford. Approval of the subdivision is not at issue in the present appeals. The subdivision is bounded on the south (along Route 7) by property of Rawlings and on the north (along Plains Road) by property of Bushey. Lot 1 contains an existing residence and has frontage on Plains Road. Lot 2 is 1.5 acres in area and contains an existing structure used by the Kelley family in the past for retail sales. Lot 2 has been designed so that it has 100 feet of frontage along the Route 7 right-of-way[1] (the minimum amount of frontage required for a commercial use in the Village zoning district), even though it is not proposed to have an actual access at that frontage.

Two driveways serve the existing property: one from Plains Road and one from Route 7. The Plains Road access is proposed to be improved and an additional Plains Road access is proposed to be added, resulting in one entrance-only access drive from Plains Road at the location of the existing access and one exit-only access drive onto Plains Road easterly of the house, to serve both subdivided lots. Appellee-Applicant has obtained permits from the selectboard for both proposed curb cuts on Plains Road.

The existing access onto Route 7 will be closed and the pavement will be cut, so that it will be maintained as a camouflaged gravel access for emergency vehicles only, blocked from public access by shrubs and perennials but capable of being driven through if necessary by an emergency vehicle, in the unlikely event that both Plains Road accesses should be blocked. The elimination of the Route 7 access will not cause an unreasonable hazard for fire or emergency vehicles. The existing Route 7 access also serves the adjacent Rawlings property to the south and will continue to serve as the Rawlings driveway.

Although the combined property has access onto both Route 7 and onto Plains Road, the combined property does not extend to the actual corner of Route 7 and Plains Road. Rather, the

property's westerly property line extends obliquely across the corner from the proposed Plains Road access driveway across the Route 7 access driveway, coming to a point on the Rawlings property.

Lot 2 also contains a pond and shelter (" goose house" ) used in the past for the raising of ducks and geese. The existing pond profiles are now shown in sheets SP1, SP2 and SP3 of Exhibit 23. It is unknown whether or which toxic pollutants may be present in the pond sediments. The pond and its surrounding wetlands qualify as a Class II wetland under the Vermont Wetland Rules.

The pond is fed by two small streams, running in two channels, one extending from the northeast corner of the combined property and one from near the southeasterly corner of the combined property. The pond was created by a small dam or outlet structure which controls the outlet at the southerly boundary of the property. The outlet stream continues to the south across the adjacent lot and another lot, and through an 18" culvert under Route 7 at Depot Road. Its outlet on the westerly side of Route 7 is within a steep ravine, through which the water flows onto the property of Appellant Armitage.

Appellee-Applicant proposes to remove the former retail building and goose house on Lot 2 and to construct on the property a building and associated parking areas and driveways to be used for the U.S. Post Office to serve the Pittsford area. Issues relating to whether it is a good idea from a town-planning or downtown-revitalization perspective to move the town's post office from a central location to a more outlying location about a third of a mile away are not within the scope of the present zoning regulations of the Town of Pittsford and are not at issue in the present appeal; they were discussed in this Court's decision regarding an earlier proposal for this project. Appeal of Armitage, Docket No. 38-3-01 Vtec (October 21, 2002). In connection with this project Appellee-Applicant proposes to drain and eliminate the pond, to create a channel for the stream between the former northerly inlet of the pond and the outlet of the pond, and to create or restore a wetlands vegetation area around the former pond and extending northerly along the stream channel. Appellee-Applicant has obtained two Conditional Use Determinations (CUDs) from the wetlands program of the Agency of Natural Resources relating to the relocation of the stream, the draining of the pond, and the construction of elements of the post office facility within the wetlands buffer.

No changes are proposed to the proposed post office building compared with that discussed in Appeal of Armitage, Docket No. 38-3-01 Vtec (October 21, 2002), except that the truck loading area is now described as enclosed. The proposed building is L-shaped, presenting the appearance of an essentially rectangular 75' x 42' building, with an extension on the southeasterly corner for the truck loading bay, and an extension on the westerly end for an entrance portico. The building occupies a total of 3,630 square feet in area. The main part of the building is covered with a gable roof draining toward the north and south, with the gable end facing Route 7. The truck loading area now has a shed roof draining only to the west. The easterly face of the building will present a 60-foot-long facade, appearing as a gable end with a flat wall extension. The building is now proposed to have a gray clapboard-style exterior and will blend in with the characteristic residential structures in the area, although it will be larger than those structures and will have the appearance of a commercial building with its related parking area.

The finished floor elevation of the building is at an elevation approximately nine feet above Route 7; the building is proposed to be 23 feet in height. It meets the front setback requirements of the Zoning Regulations with respect to both Route 7 and Plains Road, and meets the remaining setback requirements to its property lines. The building and lot coverage also meet the dimensional requirements of the zoning ordinance. The building will be served by municipal water supply and municipal (sewer) waste disposal, and has obtained the required municipal and state water supply and wastewater disposal permits. The proposed use and building design will be served adequately with fire protection and police services. The proposed use and building design

will be served adequately by solid waste disposal services, proposed so that pickup from the dumpster will occur approximately twice weekly around 6:15 to 7 a.m., before the building is open to public access.

The post office building will be open to the public for use of the lock box lobby from 7:00 a.m. to 5:00 p.m. on weekdays and from 6:30 a.m. to noon on Saturdays, and for service at the window from 8:00 a.m. to 4:30 p.m. on weekdays and from 8:00 a.m. to 11:30 a.m. on Saturdays. Approximately two to three on-site employees and three route carriers will be based at the facility, with three mail delivery truck trips per weekday and two on Saturdays. Employees and route carriers will park in the designated employee parking spaces in the southwestern parking lot. Only unit-body vans or van body style trucks approximately 16' in length will make deliveries at the facility; no tractor-trailer trucks will come onto the property. On weekdays, the first clerk will arrive at the building at 6:15 a.m., and the second clerk will arrive at the building at 6:30 a.m. The first of three mail delivery trucks will arrive between 6:15 and 6:30 a.m. and will leave no later than 7 a.m. (within 15 to 30 minutes after arrival). The three route carriers will arrive between 6:45 and 7:00 a.m., when the building's lock box lobby opens to the public. The third clerk will arrive at 8:00 a.m. when the service window opens to the public. The route carriers will leave at 9:00 a.m. for their route deliveries, which are completed by 4:00 p.m. The second mail delivery truck will arrive at 12:15 p.m. and will leave no later than 12:45 pm (within 15-30 minutes after arrival). The service window will closes to the public at 4:30 p.m. and the building's lock box lobby will close to the public at 5:00 p.m., when the third (and last) mail delivery truck will arrive. It will leave no later than 5:15 p.m. (within 15 minutes after arrival).

On Saturdays, the clerks and route carriers operate on approximately the same morning schedule), but the lock box lobby will open to the public at 6:30 a.m. The first of two mail delivery trucks will arrive between 6:15 and 6:30 a.m. and will leave no later than 7 a.m. (within 15 to 30 minutes after arrival). The service window will open to the public at 8:00 a.m. and will close to the public at 11:30 a.m. The second (and last) mail delivery truck will arrive at noon and will leave no later than 12:15 p.m.(within 15 minutes after arrival).

Appellee-Applicant proposes to construct five angled off-street parking spaces to serve the Kelley house, and to construct 24 off-street parking spaces to serve the post office building, of which three spaces will be reserved for handicapped accessibility: two for customers and one for employees. Six angled spaces (including two handicapped-accessible spaces) are located along the northerly side of the proposed building. All the angled spaces are angled so as to be accessible from the one-way entrance drive or from the other parking areas, but not from misuse of the one-way exit drive. Nine head-on spaces are located in the lot to the northwest of the building, of which four are adjacent to the building and five are across the lot from the building. A pedestrian crosswalk crosses the lot in a single location, also connecting with a sidewalk leading onto the property from Route 7. To the southwest of the building is a nine-space lot, including one handicapped-accessible space, reserved for employee parking. A sidewalk and ramp leads to the building from this lot, along the side of the truck loading access. A corresponding truck turnaround area is proposed, extending westerly next to the sidewalk leading from Route 7, to allow delivery trucks to make a three-point turn to back into the loading dock and to maneuver frontwards when entering and exiting the site. The dumpster to serve the building is also now located at the southerly end of the southwest lot, with adequate maneuvering room for trash pickup twice weekly, which is scheduled in the early morning hours when the facility is closed to the public.

Preliminary Issue

In this Court's decision regarding an earlier proposal for this project, Appeal of Armitage, Docket No. 38-3-01 Vtec (October 21, 2002), the Court denied that earlier proposal on the basis that § § 2.12.1(b) and (e) were not met. The denial was specifically

without prejudice to the Applicant's submittal to the ZBA of the same or a revised building design at such time in the future as the Applicant is able to submit revised or additional plans and data for the pond removal and stormwater treatment system to prevent erosion or water pollution and is able to show that changes are to be made to the Plains Road/Route 7 intersection (and the screening of the emergency access gate) sufficient to address the problems discussed in this decision.

The present proposal incorporates revised or additional plans and data for the pond removal and stormwater treatment system, as well for the emergency access. It also changes the access driveways for the project so as to change to some extent the interaction between the traffic using the facility and the traffic going through the Plains Road/Route 7 intersection.

However, Appellants argue that Appellee-Applicant should be precluded from consideration of any of the revised proposal until or unless changes are made to the Plains Road/Route 7 intersection itself. That statement in the earlier decision is not as limiting as Appellants suggest. It does not necessarily require changes to the geometry or signalization of the Plains Road/Route 7 intersection. Rather, any applicant is entitled to file a subsequent changed project design and to attempt to show that the standards in the ordinance with respect to that intersection are met by that changed project design together with any conditions that might be imposed. Accordingly, we consider the revised application on its merits.

I. § 3.11(second part)(b) - Circulation, parking and loading.

To grant site plan approval, § 3.11(second part)(b) requires the Planning Commission, and hence this Court, to take into consideration the objective of adequacy of circulation, parking and loading facilities.

The proposal provides an entrance-only driveway and an exit-only driveway from Plains Road, each 18 feet in width. The entrance driveway provides access to the customer parking spaces, and provides a clear maneuvering path to the loading dock for the mail delivery trucks. Vehicles entering by that drive are required by a stop sign to stop where the drive enters the parking areas, before proceeding to find a space or to proceed to the drop boxes. The location of the dumpster at the end of the southwest parking lot allows a similar ease of maneuvering for the twice-weekly garbage truck pickup of trash from the dumpster. The exit-only drive provides space for a passenger vehicle to pass by another vehicle stopped at the drop off boxes, although there is no reason to expect that vehicles will take a very long time at the drop off boxes.

The signs proposed for the entrance and exit drives are amply marked to indicate their one-way configuration. The entrance-only access is marked with a one-way arrow and an " Enter'sign at the Plains Road end, and by " Do Not Enter" and " Wrong Way' signs at the parking lot end. The exit drive is marked with a one-way arrow and " Exit'sign at the parking lot end, and by " Do Not Enter" and " Wrong Way' signs at its intersection with Plains Road. " No Parking" are posted to prohibit parking along the entrance and exit driveways.

Signs are proposed to prohibit postal patron parking in the five parking spaces associated with the Kelley house. Those spaces and the six parking spaces on the north side of the post office building are angled to be compatible with the direction of one-way traffic flow for the entrance and exit driveways.

The 29 parking spaces provided on the site plan, including 5 for the existing Kelley residence, 2 handicapped-accessible spaces for customers on the north side of the post office building, 1 handicapped-accessible space for employees in the southwest parking lot, and 21 additional parking spaces, provide adequate parking for the facility and meet the parking requirements of the Zoning Regulations. The separation of the employee parking lot from the postal patron

parking, and the corresponding signs indicating "Employee Parking Only" will reduce the potential for conflict between customers' vehicles and the path of access to the loading dock for the mail delivery vehicles. The location of the dumpster and the plan to empty it when the post office is closed to the public will also avoid conflict with vehicles or pedestrians.

Pedestrian circulation on-site from Route 7 is facilitated by a sidewalk leading up onto the site from Route 7, and a crosswalk to a sidewalk extension in the northwest parking lot. The pedestrian exposure to vehicles in the parking lot is minimized by this configuration, and only the midday truck delivery will occur on weekdays in a time frame during which the post office is open to the public. The backing movement for that delivery truck into the loading dock follows a path that does not conflict with any of the pedestrian pathways and does not conflict with any of the public parking spaces. It is not unreasonable to expect that any employees seeking to enter or leave the employee parking spaces when a delivery truck is on the premises will know of the presence of the truck at the facility and be able to avoid any conflict with it.

Although there is room for pedestrian circulation onto the site from Plains Road up the westerly shoulder of the exit-only driveway, because no sidewalk is proposed there and no pedestrian access is marked, there is no reason to assume that pedestrians or bicyclists coming from Plains Road would in fact use that shoulder rather than the paved exit drive. Such use of the paved portion of the exit drive could create conflict between vehicles seeking to exit the facility and pedestrians or bicyclists seeking to enter the facility. Accordingly, for pedestrian on-site circulation to be adequate and for exiting vehicles to be safely isolated from those pedestrians, we must condition any approval under this criterion on the addition of a sidewalk up the northerly shoulder of the exit drive.

The post office building is designed with a loading dock on the southerly side of the building, and a corresponding turnaround across the parking lot from it, to accommodate mail delivery vans or trucks delivering mail to and picking up mail from the facility. These trucks are van body-type trucks approximately 16' in length; larger tractor trailer-type trucks will not deliver to this facility. The schedule of deliveries and the small number of daily truck trips minimizes the potential for conflict exists between the trucks entering the facility and the postal patrons' and employees' vehicles or the pedestrians who access the site.

The site will be cleared of ice and snow as necessary due to weather conditions. Snow from the northerly portion of the site will be plowed to and stored in the northerly stormwater settling basin northerly of the exit drive. Snow in the westerly and southerly portion of the site will be plowed and stored in the southwesterly stormwater settling basin located southerly of the southwestern parking lot. The storage of snow in the stormwater detention basins provides sufficient storage so that the proposal adequately provides for snow removal for the parking lots and sidewalks. The issue of pollutants in the snow or meltwater is discussed in Section II, below.

With the condition below relating to a sidewalk within the northerly shoulder of the exit drive, the proposal meets site plan approval criterion § 3.11(second part)(b), in light of the objective of providing adequate circulation, parking and loading facilities.


II. § 2.12.1(b) - Unreasonable Hazard or Impact due to Erosion or Water Pollution

To grant conditional use approval, § 2.12.1(b) requires a finding that the proposal will not cause any unreasonable hazard to or impact upon health, property or property values through fire, unsanitary conditions, erosion, noise, air or water pollution. The proposal will not cause any unreasonable hazard to or impact upon health, property or property values through fire, unsanitary conditions, noise, or air pollution. We must examine whether the construction practices

or the proposed handling of stormwater runoff will cause any unreasonable hazard to or impact upon health, property or property values due to erosion or water pollution.

A Class II wetland was identified on the site as encompassing at least the pond and a surrounding area marked with an existing wire fence and labeled as "edge of wetland" on Sheet SP3 (Existing Conditions) on the site plan. The wetland as it existed with the pond was identified as significant at least for the function of water storage for flood water and storm runoff and for the function of surface and ground water protection.

Appellee-Applicant has obtained approval from the state wetlands program under the Vermont Wetlands Rule (referred to as a conditional use determination or " CUD" ) in two CUDs to drain and eliminate the pond, to create a channel for the stream between the former northerly inlet of the pond and the outlet of the pond, and to create or restore a wetlands vegetation area around the former pond and extending northerly along the stream channel. More of the property will be vegetated in a natural condition than before the project, when the area was mowed up to the edges of the stream and only one tree existed in what is the 50-foot riparian buffer area.

The CUDs recognize that a portion of the building and portions of the proposed sidewalks and paved parking areas will be located within the 50-foot buffer to the west of the stream. However, all the drainage from the building is directed initially away from the buffer onto paved areas which drain by sheet flow to two stormwater settling basins or management areas, each of which is constructed so that sediments are retained and water passed through a stone and sand filter berm before passing in sheet flow across a grassy or otherwise vegetated area.

The pond removal and subsequent stream channel restoration is governed by a restoration plan that adequately provides for erosion and sediment controls to prevent downstream impacts during the restoration process. However, the draining and restoration procedure outlined on sheet SP2 of the current plans (Exhibit 23) is insufficiently specific in several respects to ensure that the proposal will not cause an unreasonable impact over the longer term, due to water pollution or erosion. Accordingly, a condition must be imposed requiring the inadequate specifications to be provided and approved before the commencement of the pond drainage and stream restoration.

In particular, the " stream wetland restoration procedure" on Sheet SP2 of Exhibit 23 (the site plans) must be amended to specify the following in advance of commencing the pond removal and stream channel restoration:

- which contaminants must be tested for, and from how many different locations within the former pond bottom. What is the level of contamination that would warrant removal of material from the site, or what procedure or review would the contractor or engineer undertake to determine that answer, and to determine how much material should be removed.

- what streambed material will be placed as floor of the channel in what layers of sand, gravel and cobbles to restore a natural channel similar to the upstream channel. Should any particular types or characteristics (such as pH) of materials be avoided or sought as being characteristic of the less disturbed upstream areas beyond the property.

- what are the specifications of soil types, and should they be more specific than merely " native silt loam" or " clayey loam" , that are appropriate to be used for fill within the former pond to create stable banks for the new stream channel, to prevent erosion, and to provide an appropriate pH and growing medium for the native plants sought to be established in the former pond area.

The vegetation proposed to be planted within the 50-foot-wide buffer along both sides of the stream will assist the buffer in returning to more closely resemble the native condition of such a stream. If the above specifications are added to the pond removal and stream restoration

methodology, the proposal will not cause an unreasonable hazard or impact through erosion or water pollution.

Due to the size of the proposed impervious areas to be added by this project, no stormwater management permit is required by state regulations to manage the expected increase in volume of stormwater. However, the expected velocity and direction of stormwater flow must nevertheless be analyzed to determine whether it will create unreasonable erosion or water pollution, under § 2.12.1(b) of the conditional use standards.

The project is now designed with two stormwater settling basins or management areas designed to handle the 10-year, 24-hour storm event. The northerly portion of the building and parking lot will drain by sheetflow into the stormwater settling basin located in the northerly portion of the property northeast of the exit drive. Drainage from the southerly portion of the building and parking lot will be directed into the stormwater settling basin southerly of the southwestern parking lot, over an additional crushed stone edging. Sediment will settle out in the bermed basins, while water will pass through the filter berm and the stone " level spreader" edge of the berm and flow in sheet flow across flat vegetated areas towards the stream or onto neighboring property.

The present stormwater runoff from the project site is calculated as 6.15 cubic feet per second, while the runoff from the site in its native condition (without structures) would have been 3.9 cubic feet per second. The proposed design is calculated to reduce runoff to 3.5 cubic feet per second. The stormwater runoff from the building and parking areas is likely to contain the constituents typical of runoff from passenger vehicle parking lots and building roofs. It would be instructive to test the inflow and outflow of the stream at the property boundaries, as well as the outflow of the culvert into the ravine at Depot Road, before any changes to the property, after construction, and periodically during operation, to determine the actual constituents of the runoff and its contribution to the runoff in the ravine, but such testing is beyond the scope of this proceeding.

The erosion control plan to control erosion and water pollution during construction is adequate to prevent unreasonable downstream impacts or effects on neighboring property.

With the conditions below relating to the pond drainage and testing protocol, the proposal meets conditional use approval § 2.12.1(b) in that it will not cause any unreasonable hazard to or impact upon health, property or property values through erosion or water pollution.

III. § 3.11(second part)(c) - Landscaping, screening and setbacks.

To grant site plan approval, § 3.11(second part)(c) requires the Planning Commission, and hence this Court, to take into consideration the objective of adequacy of landscaping, screening and setbacks with respect to achieving maximum compatibility and protection to adjacent property. The proposal meets the setbacks required in the regulations

Extensive landscaping and tree preservation has been incorporated into the project. All existing large trees on the property will be preserved. A screening hedge of arborvitae will be planted to achieve maximum compatibility with and protection of the Rawlings property to the west and the Bushey property to the north. A screen of perennials and shrubs will be planted across the former Route 7 access to block vehicles, both physically and visually, from proceeding by way of that access. The riparian buffer area in the easterly portion of the project will be planted with maples, dogwoods, winterberry, elder and viburnum as part of the stream restoration. With the condition discussed above to ensure that the soil added to the site in the location of the former pond is suitable for the wetlands vegetation sought to become established, the proposal meets site plan approval criterion § 3.11(second part)(c), in light of the objective of providing adequate

landscaping and screening to provide maximum compatibility with and protection of adjacent properties.

IV. § 2.12.1(e) - Effect on traffic on roads and highways in the vicinity and § 3.11(second part)(a) - safety of vehicular circulation between the site and the street network

To grant conditional use approval, § 2.12.1(e) requires a finding that the proposal will not adversely affect the traffic on roads and highways in the vicinity. To grant site plan approval, § 3.11(second part)(a) requires the Planning Commission, and hence this Court, to take into consideration the objective of maximum safety of vehicular circulation between the site and the street network, giving particular consideration to visibility at intersections, to traffic flow and control, to pedestrian safety and convenience, and to access in case of an emergency. The emergency access for the project is adequate.

We discuss each of the movements for vehicular circulation on and off the project property. Evidence as to intersection or corner sight distance and as to stopping sight distance is useful in this analysis, because the longer intersection sight distance is needed for a driver determining whether it is safe to pull out into traffic, while stopping sight distance is the minimum needed for the vehicle already traveling along the roadway to perceive and avoid the turning vehicle as it temporarily obstructs the roadway during the turning movement and accelerates into the stream of traffic.

The present design provides a right turn from the eastbound lane of Plains Road into the project entrance driveway, a right turn from the project exit driveway into the eastbound lane of Plains Road, a left turn from the westbound lane of Plains Road into the project entrance driveway, and a left turn from the project exit driveway into the westbound lane of Plains Road. The redesign of the project to have separate entrance and exit drives, with the exit driveway at a greater distance from Route 7, has addressed the problem identified in the 2002 decision as the potential conflict between traffic turning right from the northbound lane of Route 7 onto the eastbound lane of Plains Road and traffic exiting the project driveway to turn left onto Plains Road. With the present design, vehicles will have sufficient sight distance to make the turns onto or off the project property safely.

Specifically, a vehicle turning right into the project entrance from Plains Road will be visible to the driver of any vehicle following from behind around the curve from Route 7 onto Plains Road and will be able to make the turn without any conflict. A sign visible on Plains Road just after the turn from Route 7 warns of the entrance driveway intersection ahead. Because a vehicle positioned to turn left from the westbound lane of Plains Road into the project driveway is located farther to the north than would have been a vehicle seeking to exit the facility at that location, the driver will have a longer sight distance and a better angle to see vehicles coming around the corner from Route 7 onto Plains Road, and will have sufficient time to turn safely into the project driveway. Similarly, a driver coming around that curve will perceive the vehicle waiting in the westbound lane earlier than the driver could have perceived a vehicle attempting to exit at that location. Changing the location of the exit driveway for the proposed project provides the maximum safety afforded within the constraints of this isolated corner lot. Further, only approximately one or two entrances are projected to be made by turning left across Plains Road in any peak hour.

At the exit driveway, the driver of a vehicle seeking to turn right on Plains Road will have sufficient sight distance to see vehicles traveling eastbound on Plains Road from the Route 7 intersection and to be able to avoid conflicts when pulling out onto Plains Road. There is also sufficient sight distance from the exit drive along Plains Road to the east, to be able to see westbound traffic in enough time to pull out into the westbound lane of Plains Road.

As discussed above regarding pedestrian access and on-site circulation, a pedestrian sidewalk will be required to be provided within the northerly shoulder of the exit-only driveway for pedestrian access to Plains Road. Pedestrian safety and convenience is also provided by a pedestrian access onto the site from Route 7, and by a temporary bituminous sidewalk southerly along the easterly side of Route 7. However, despite the location of the existing pedestrian sidewalk on the west side of Route 7, the evidence does not support the location of a pedestrian crosswalk across Route 7 at the northerly end of that existing westerly sidewalk. Rather, the evidence suggests that it is not safe for pedestrians to cross at that location due to the lack of sufficient sight distance respecting vehicles traveling south on Route 7 as they come over the crest of the hill at Plains Road.

Appellee-Applicant has no control over the placement of a crosswalk across Route 7; such a crosswalk can be installed only after approval by the Vermont Agency of Transportation. However, the relocation of the area's post office to Appellee-Applicant's project site will increase the demand for pedestrian access along Route 7. Accordingly, Appellee-Applicant proposes to bear the cost of striping a crosswalk in the Plains Road area should one be warranted. To facilitate the determination of the choice of location of a crosswalk between Depot Road and Plains Road, in order to support pedestrian safety and convenience in reaching the new post office site, we will require that by the time the project is constructed, Appellee-Applicant also shall have a consultant prepare a recommendation for the safest location for a pedestrian crosswalk (regardless of existing demand for such a crosswalk) between and including the Depot Road and the Plains Road intersections, and shall submit such a proposed location to the Vermont Agency of Transportation for approval.

Both Route 7 and Plains Road can handle the volume of additional traffic expected to be generated by the project. However, we must carefully analyze the effect of that portion of the traffic that will use the Plains Road/ Route 7 intersection, as the existing geometry of the intersection and of Route 7 to the north of the intersection pose particular constraints on the smooth movement of vehicles through that intersection. In addition, characteristic of stop-controlled intersections of a minor road with a major through road, the left turn onto the major road from the minor road experiences much greater delay than other turning movements within the intersection, and the contribution of the added traffic from the proposed facility must be examined to determine if it will have an adverse effect beyond that caused by normal background traffic growth in the area.

Plains Road intersects Route 7 at an acute angle, rather than at the 90E or right angle recommended for roadway intersection construction. To maximize its safety until such time as the intersection improvements can be made, the area at the intersection is wide enough to be striped with pavement markings that turn the traveled lanes as they approach Route 7 so as to make a 90E angle. It is not unsafe if adequate sight distances can be obtained in all directions of and from the intersection. The pavement markings (stop bar and line striping) at the intersection have become faded over time and Appellee-Applicant proposes to restripe the stop bar and line markings in connection with this project.

The sight distances are ample for the driver of a vehicle stopped at the stop bar westbound on Plains Road to see approaching traffic coming from the south on Route 7, and for that traffic to see a car waiting at the intersection or engaged in turning through the intersection. In the winter, accumulated snow does not impede the observation of these sight distances.

The driver of a vehicle stopped at or near the stop bar westbound on Plains Road, on the other hand, experiences an odd phenomenon when observing vehicles approaching the intersection traveling south on Route 7. The roadway incline of Route 7 on the uphill approach to the intersection is not a uniform angle; rather, it is slightly steeper in the middle of the hill and flattens out as it approaches the crest at Plains Road. Sight distances are ample to observe such vehicles from a long distance away, but as they approach the intersection of Route 7 with Plains Road the

lower portions of the approaching vehicles are partially obscured for a short time by the change in angle of the roadway incline (or camber or both) as the vehicles approach the intersection. The driver of a vehicle traveling on Route 7 south has sufficient sight distance to see a vehicle waiting or beginning the turn into the intersection. The driver of the turning vehicle may lose focus on the approaching vehicles as they enter and then " pop" out of the partially-obscuring angle. In addition, the speed limit is reduced to 35 miles per hour for vehicles ascending the hill and approaching the intersection, but this limit is commonly exceeded, at least until the vehicles crest the hill and approach the more populated area closer to the village center. That is, the sight distances for the left turn from Plains Road westbound onto Route 7 southbound maximize safety only if the southbound vehicles observe the speed limit and are aware of the potential to encounter turning vehicles at the crest of the hill. Accordingly, until the intersection improvements planned for this intersection are implemented, it will be necessary as a condition of this approval for Appellee-Applicant to fund the installation of a warning sign at an appropriate location selected by a traffic consultant on the Route 7 southbound hill, for vehicles approaching the intersection, stating the 35 m.p.h. speed limit and warning to the effect of " intersection ahead" or " watch for turning vehicles," with a blinking yellow warning light above the sign, if recommended by a traffic consultant and approved for installation by the Vermont Agency of Transportation.

In addition, in the winter, accumulated snow may impede the observation of these sight distances, if it is not promptly cleared within the corner sight triangle. Although neither the town nor the state is a party to these proceedings, we urge the parties to advise town and state officials of their experiences with snow at this location and the importance of keeping the snow cleared for the proper and safe functioning of that intersection.

The remaining analysis on the question of whether the proposed project will have an adverse effect on traffic on the surrounding roads relates to the ability of the Plains Road/Route 7 intersection to function at an acceptable level of service. This intersection is a T intersection of a minor town road with a major state road, controlled with a stop sign on the minor road only. It is characteristic of such a stop-controlled intersection that there is nearly no delay on the major road, representing a high quality level of service (nearly no delay - letter grade of " A" ) for the major road and the intersection as a whole, but a substantially lower level on the stop-controlled minor road. That is the case with the current intersection. A letter grade of " D" represents a delay due to the stop sign of 25 to 35 seconds, while " E" represents a wait of from 35 to 50 seconds.

For the turning movement westbound from Plains Road southbound on Route 7, the delay due to the stop sign is already in the C to D range. The parties' experts differ in their estimation of the delay for each time frame by only a few seconds. The delay in this turning movement may become a problem for traffic at this intersection, but the project's contribution to the projected delay is not enough to attribute the deterioration in the intersection's functionality to the proposed project. That is, the left-turning movement from Plains Road to Route 7 is already C or D, depending on the time of day, and will deteriorate over time if no improvements are made to the intersection. The problems are inherent in the type of intersection and will not be substantially adversely affected by the project. If, however, any studies are undertaken towards improvement of the intersection, including considerations of a sensor-controlled signal operating at only certain times of the day, Appellee-Applicant may be expected to contribute to the cost of those studies and to the subsequent intersection improvements..

With the additional conditions relating to the signage on Route 7 southbound just north of the Plains Road intersection, the proposal meets site plan approval criterion § 3.11(second part)(a), in light of the objective of providing maximum safety of vehicular circulation between the site and the street network. With the same conditions, the proposal meets conditional use approval § 2.12.1(e) in that it will not adversely affect the traffic on roads and highways in the vicinity.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that conditional use approval and site plan approval are GRANTED, subject to the following additional conditions as well as any imposed by the ZBA and Planning Commission.

1. Deliveries by tractor-trailer trucks shall not be permitted on the property without further amendment of the site plan and on-site circulation pattern.

2. Appellee-Applicant shall fund the installation of a warning sign on the Route 7 southbound hill to the north of the Plains Road intersection, visible to vehicles approaching the intersection from the north, stating the 35 m.p.h. speed limit and warning to the effect of " intersection ahead" or " watch for turning vehicles," with a blinking yellow warning light above the sign, with the text of sign and type of light, and placement of the sign to be recommended by a traffic consultant and approved for installation by the Vermont Agency of Transportation.

3. Appellee-Applicant shall also have an appropriate traffic consultant prepare a recommendation for the safest location for a pedestrian crosswalk (regardless of existing demand for such a crosswalk) between and including the Depot Road and the Plains Road intersections, for submittal to the Vermont Agency of Transportation for approval.

4. Appellee-Applicant shall design and add to the site plan a pedestrian walkway or sidewalk within the northerly shoulder of the exit drive, to conduct pedestrians from Plains Road to the building.

5. Appellee-Applicant shall amend the " stream wetland restoration procedure" on Sheet SP2 of Exhibit 23 (the site plans) must be amended to specify the following in advance of commencing the pond removal and stream channel restoration:

> - which contaminants must be tested for, and from how many different locations within the former pond bottom. What is the level of contamination that would warrant removal of material from the site, or what procedure or review would the contractor or engineer undertake to determine that answer, and to determine how much material should be removed.
>
> - what streambed material will be placed as floor of the channel in what layers of sand, gravel and cobbles to restore a natural channel similar to the upstream channel. Should any particular types or characteristics (such as pH) of materials be avoided or sought as being characteristic of the less disturbed upstream areas beyond the property.
>
> - what are the specifications of soil types, and should they be more specific than merely " native silt loam" or " clayey loam" , that are appropriate to be used for fill within the former pond to create stable banks for the new stream channel, to prevent erosion, and to provide an appropriate pH and growing medium for the native plants sought to be established in the former pond area.

Dated at Barre, Vermont, this 1st day of September, 2004.

_____

Merideth Wright

Environmental Judge

---

## Footnote

[1.]     This frontage does not abut the traveled way of Route 7 as it now exists. As proposed, Lot 2 does not have access to Route 7; rather, it has access to Plains Road via two driveways passing over Lot 1. Despite the odd shape of the lots, nothing in the Zoning Regulations requires the actual access to be via the portion of the property having the road frontage.